## OSTERHOUDT v. OSTERHOUDT.

(Supreme Court, Appellate Division, First Department. February 9, 1900.)

DIVORCE—ADULTERY—CUSTODY OF CHILDREN.

> Where plaintiff obtained a divorce on grounds of the wife's adultery, which charge was based on the fact that she had obtained a decree of divorce in a foreign jurisdiction, and had remarried, a decree granting her the custody of the children—two daughters, aged 11 and 7 years—will not be disturbed when it appears that the wife is a proper person for their custody, no other misconduct than her remarriage being shown, and that she has a comfortable home for them, and has long had the care and expense of their living and education, and that they are much attached to, and wish not to be separated from, her, while the husband has less means, had no home provided for the children, and had never shown a strong desire for their companionship.

> Van Brunt, P. J., and Barrett, J., dissenting.

Appeal from special term, New York county.

Action by Harris P. Osterhoudt against Ella H. Osterhoudt. Judgment granted plaintiff a divorce and defendant the custody of the children. Plaintiff appeals from the order (59 N. Y. Supp. 797) granting the custody. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

William M. Mullen, for appellant.

Eldon Bisbee, for respondent.

INGRAHAM, J. This action was brought by plaintiff to obtain a divorce from the defendant upon the ground of her adultery. Judgment was granted to the plaintiff dissolving the marriage, and awarding the custody of the two infant children of the marriage to the defendant, and the plaintiff appeals from so much of the judgment as disposes of the custody of the children.

It appears that the parties to this action were married in the year 1879, and they seemed to have lived together in this city or vicinity until about the year 1895. The plaintiff is employed and resides in the city of New York, and since the fall of 1885 the defendant appears to have resided principally in Utica, N. Y., although she spent a portion of the time in the city of New York, with her husband. In February, 1897, she left the plaintiff, and since that time has resided away from him at Utica and in Bethlehem, Pa. Efforts were made by the plaintiff's brother to procure a reconciliation between the parties, which were unsuccessful, and in the latter part of the year 1897 the defendant went to the state of North Dakota, and on February 12, 1898, commenced an action in that state for a divorce from the plaintiff upon the ground that the plaintiff had failed to provide for her and her children the common necessities of life. Such proceedings were had that on June 30th judgment was entered in the district court of Morton county, in the state of North Dakota, granting the defendant an absolute divorce from the plaintiff. Subsequently the defendant returned to the state of New York, and in October, 1898, at Jersey City, in the state of New Jersey, she married one James Wilson, and since that time has lived with him as his wife;

and it was the defendant's relation with Wilson upon which the plaintiff based the charge of adultery, which resulted in the judgment of divorce granted in this action. There are two children of this marriage,—one born on September 3, 1881, who was 17 years of age at the time of the trial; and the other, born in 1887, was 11 years of age at the time of the trial. Both daughters have resided with their mother (the defendant) from their birth, and to the present time they have been under the constant care of their mother, who has always acted towards them as a devoted mother, and to whom these daughters appear, from the testimony, to be fondly attached. The defendant has superintended their education; has, out of her private means, paid their school bills, and is continuing the education which she has thus supervised and controlled. Both daughters were examined on the trial, and testified to their strong affection for their mother, and their desire to continue to live with her. It further appears that the plaintiff has no home in New York, that he is living in a boarding house, has an income of $2,000 a year, which he has received several years, and there is no evidence that he has any expectation of receiving any greater income; while the defendant has property of her own, has a comfortable home, and is able to amply provide for her daughters, giving them proper education and support, and giving to them the care and attention which daughters require from a mother. There was no charge of any kind against the character of the defendant, except so far as she was guilty of adultery by reason of her marriage to Wilson after she obtained a decree of divorce in the state of North Dakota. The plaintiff testified that he was served in the city of New York with the summons and complaint in the action in the state of North Dakota, but declined to appear in that action, or take any part in the proceedings there, under advice of counsel; that, after the final separation in 1897, plaintiff made no effort in any way to protect or care for the children; made no provision for their support, education, or maintenance. Although he knew that his wife had definitely separated herself from him, and had commenced an action to obtain a divorce from him, he refused to make any provision for them during this period, allowing the mother to provide for the children,—support, educate, and maintain them. He expressly testified upon the trial that he had no reason for thinking that the mother was not a proper custodian for the children beyond the fact that she had married the second time. In the whole record the only offense charged against the defendant—the only fact from which any inference could be drawn that she was not in all respects a good woman, and the proper person to administer and care for the welfare of these two children—was that, after she had obtained a divorce in the state of North Dakota, believing that divorce to have finally dissolved the relations between herself and the plaintiff, she contracted the second marriage. This second marriage was valid in New Jersey if the court of North Dakota had jurisdiction, and, if valid there, would have been valid here. Moore v. Hegeman, 92 N. Y. 525. Upon these facts the question as to what course would best preserve the future interest of these children was presented to the court below, and the court had to determine, in the exercise of its judicial dis-

cretion, as to which of the parents the custody of the children should be awarded, considering their future welfare. The rights of the parties to the action were subordinate to the welfare of the children. The misconduct of the defendant in contracting her second marriage depended entirely upon a legal question as to the jurisdiction of the court of the state of North Dakota to pronounce the decree of divorce. If that court had jurisdiction to grant that divorce, no one would say that the conduct of the defendant in contracting the second marriage was blameworthy, or would interfere in any way with her right to be awarded the custody of these children. Does the fact that she had made a mistake as to the legal effect of this decree, or as to the jurisdiction of the court of North Dakota to grant a divorce which would be recognized in this state, so affect her character as to justify this court in reversing the action of the court below in awarding the custody of these children to her? The children are warmly attached to her. She has devoted her life to their welfare; has provided for their support and education; and it certainly would be a cruel act, unless the welfare of the children imperatively demanded it, to deprive them of the companionship of an affectionate and loving mother, and assign them to the care of a father who has shown by his conduct that he had no very strong desire for their companionship, and where there is no evidence to show that he is able to provide a proper home for them. These facts would seem to justify the conclusion of the court below that the happiness and welfare of these two daughters would be best protected and preserved by leaving them where they both desire to be,—with the person who, from their birth, has had the charge of their maintenance, education, and support, and who has faithfully and intelligently performed her duty towards them. I think it may be said that the time has passed when courts of law are bound to recognize a right of property in children as belonging to parents, or that the father has any inherent right superior to that of the mother to the custody of their children. In this state, by the domestic relations law (chapter 272, Laws 1896), the right of a mother to the guardianship, custody, and control of the children is plainly recognized as being equal to that of the father; and while it is quite true that the willful desertion of her husband by a married woman, without just cause, may, of itself, be sufficient to show that her character is such that it would not be safe to intrust to her the education and care of her children, the facts of this case would not justify such a finding. It is apparent from the testimony that force would be required to compel these children to leave their mother and reside with the father, and I do not think that the court would be justified, under the circumstances, in making and enforcing such a judgment, and in compelling these children to live with the father, when it would seem to be for their interest that the mother should continue to supply them with a mother's care, and where the father has shown no ability to properly provide them with a home and make provision for their material interests, or to supply them with the care which all young girls require. We have to determine this question upon the record which was before the court below and is now before us, and it does not appear that the defendant con-

tinued in her relation with Wilson after it was adjudged that such relation was unlawful. I do not think, therefore, that we would be justified in overruling the discretion of the judge who tried the case and had the parties before him.

The judgment appealed from should be affirmed, with costs.

RUMSEY and O'BRIEN, JJ., concur.

BARRETT, J. (dissenting). This is, I apprehend, the first time in the juridical history of any civilized country when the custody of the children of the marriage has been denied to the innocent plaintiff in a divorce suit and granted to the guilty defendant. It is so momentous a departure from universal precedent that the grounds upon which it proceeds should be critically examined. The fundamental fact found by the court was the defendant's adultery. It was open, continuous, and unrepentant. Upon that finding the court granted the plaintiff a divorce, and in the same decree awarded to the convicted defendant the custody of the children, and authorized her to bring them up in the home of the man with whom she committed the adultery. This is sought to be justified on the following grounds: That the adultery was but the legal consequence of the defendant's mistaken judgment as to her real status; that she intended to marry Wilson, and believed that she had a legal right to do so; that, with the exception of this single "mistake," her life has been blameless; that she has been a good and loving mother; that the children are devoted to her; that they do not care for their father; that they have become "very fond" of Wilson; that their father is a poor man, earning but a small income, while their mother has a comfortable home with Wilson, has property of her own, and is able to provide amply for them. Upon these grounds the respondent invokes the rule that the welfare of the children, which is the paramount consideration, should incline the court to treat their mother's offense as technical or venial; to sanction their enjoyment of the material advantages which her pecuniary condition and present relations afford, and not to deny them the comfort of maternal affection. This is nothing but a specious plea for the laxity of the marriage relation, and it is as unsound as it is vicious. The defendant made no "mistake" in the execution of her deliberate purpose to free herself from the husband she had ceased to love and to ally herself with another. In February, 1897, she left her husband for no apparent or disclosed cause. The plaintiff's brother, Julius, then went to Bethlehem, where she was stopping, and begged her to return, and live with her husband; but she refused, assigning no reason. He visited her again, when she was living in Utica, and made another earnest effort in the same direction, still without success. Upon this occasion she told Julius plainly that what she wanted was a divorce, and Julius replied that she was not entitled to and could not get one. Her next step was to go to North Dakota, where she remained long enough to obtain one of the decrees of divorce for which that state has become notorious. This decree was not only void for want of jurisdiction, but

it was inherently fraudulent. All the circumstances point to the fact that the defendant imposed upon the Dakota court by the sworn statement that she was, and had been for 90 days immediately preceding the commencement of her action, a resident of that state in good faith. She was married in this state, and the evidence tends to show that she has resided here ever since. She went to Dakota, plainly, not to reside there in good faith, but to obtain a divorce in bad faith. She went there to evade the laws of this state, where her contract of marriage was made, and where the statute forbade her divorce, to secure her freedom, under lax laws, upon an accusation that was as false as it was trivial. Her sole complaint in the Dakota court was that her husband had, "since May, 1895, wholly and willfully failed and neglected to provide for her and her children the common necessaries of life." This accusation was untrue, as appears by the undisputed evidence in the present record. When the defendant lived with the plaintiff, he paid $30 a week for the board of his family. This was more than three-fourths of his income. He testified without contradiction that all the money he earned was spent upon his family. He produced checks and receipted bills for $545 that went directly to the family in the year 1895, in addition to cash given to his wife; and similar vouchers to the extent of $836 in 1897. These checks, and others for the sums spent in 1896, he handed to the defendant's counsel, and was proceeding to give further details, when the learned trial justice interposed with the observation that he did not "propose to go into an accounting for every check he spent." There was a still grosser imposition upon the Dakota court in the concealment from it of the fact that during the very period covered by its finding that the husband had willfully failed to provide for his wife and children the common necessaries of life she was living with the children apart from him, and resolutely refusing to return to her duty. The decree was made upon the 30th day of June, 1898, and the defendant abandoned her husband upon the 11th day of February, 1897. And yet it was for the failure to provide her with the common necessaries of life "for more than one year next preceding the commencement of the action" that the court granted her its decree. But for the suppression of the truth (as to the abandonment) and the affirmative statement of the untruth (as to the failure to provide the common necessaries of life), it is inconceivable that the Dakota court could have granted such a decree. It is entirely clear, therefore, that the defendant procured the decree in question upon the pretense of a bona fide change of residence, upon a sworn complaint which she knew to be untrue, and by the suppression of a fact which she also knew would necessarily be fatal to her purpose. She had no reason to doubt the utter invalidity of the decree thus obtained, and the sequel clearly indicates that she placed but little reliance upon it. It is needless to say that she did not remain long in North Dakota after the decree there was signed. In the following October we find her again in this state. First, however, she seems to have gone to Jersey City, where, upon the 22d day of that month, she went through the form of a civil marriage

with Wilson,—the mayor officiating. Two days later she supplemented this with a religious ceremony at West Hampton, on Long Island, in this state, bringing herself within the rule of People v. Baker, 76 N. Y. 78, under which rule it is difficult to perceive how the defendant can escape the serious charge (of bigamy) connected with the commission of that act. It is quite evident that the offenses which are interwoven with the Dakota decree, and which permeate the defendant's conduct throughout, are mala in se. It seems to be a shocking judicial conclusion that the moral training of these two young girls is to be intrusted to one who, to speak moderately, has reached her goal in the manner which this record discloses. Are these children to be brought up in the atmosphere of the home thus created, and in the center of the principles upon which it rests? There is no reality here in the pretense of mistake. If the defendant did not know that the Dakota decree was fraudulent as well as void, it was because she lacked the moral sense to appreciate her own acts. She certainly did know, however, that it was a nullity when her husband brought this action. Her legal advisers did not fail to realize, and doubtless to advise her of, the situation in which she was then placed. The law, as expounded by the court of appeals, was not of recent origin. For many years it had been impressed upon our jurisprudence in firmly repeated adjudications. Did she then recede from her false position? Did she retire from the adulterous association? No. She still covered herself with the thin and unclean veil of the Dakota decree, and kept on her determined course, still living openly with the man of her later choice, and utilizing the interval until the trial in poisoning the children's minds against their father. The youngest of these children was asked how she became impressed with the idea that her father had not been kind to her mother, and her reply was: "Because mamma has told me things that he did, and I believe her." The following questions were then put to her by the learned trial justice, and she gave the following answers:

"Q. Hasn't somebody else besides your mother told you things? A. No. Q. No one besides your mother has told you anything about your father? A. No. * * * Q. We are speaking about your mother. What did he ever do that you saw that was unkind? A. He never did anything to her. He never gave her anything. Q. He never gave her anything? A. No. Q. Is there anything else? A. I don't know. Q. If you think of anything * * * that your father ever did to your mother that was unkind, that you saw, I want to know it. A. I think all children love their mothers better than they do their fathers. Q. I don't want to annoy you, but, as I have got to decide this case, I want you to tell me any reason that you have for thinking that your father was an unkind father, or an unkind husband,—anything you can think of. You need not be at all afraid to tell me. Can you think of anything? A. No. Q. You can't think of anything? A. No."

As already pointed out, there is nothing in the record even suggestive of cruelty or unkindness on the part of the plaintiff. His only crime in the eyes of the defendant seems to have been his limited income. The "things" which she told to this little child "that he did" have apparently been told to no one else; certainly not to the court. Are these children, then, to be taught to hate their blameless father, and to love his successor? Are they to learn, as

they grow up, that there is no inherent sanctity in the marriage bond, that duty is an old-fashioned notion, that the desire of the heart or the craving of the senses is the essential thing, and that all acts are righteous which lead to their gratification? It would be better for these children—better for their future here, and better for that wider future which lies beyond—that they should share the modest and humble environment of their innocent father than enjoy the material advantages, or even a mother's love, at the expense of principle and morality. Their choice should not weigh with us for a moment. If they desire to live with the daily and hourly spectacle of this new home before their eyes, their moral sensibilities have already been blunted, or else they are too young to appreciate the situation. In either case a court of justice should not fail to guard and guide them correctly. The sorrow of the moment will be effaced when they realize, under less "progressive" and more righteous teachings, what it is from which they have escaped. I cannot but think that the affirmance of this provision of the judgment appealed from would be a lasting stain upon the records of the court. Before such a precedent is made,—rewarding the guilty, punishing the victim, and dooming the children to participation in successful evil,—there should at least be protest.

The judgment, so far as appealed from, should therefore be reversed, and the custody of the children awarded to the plaintiff.

VAN BRUNT, P. J., concurs.